IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Sara Hoover,                                    :
                    Appellant              :
                                               :
        v.                                 : No. 532 C.D. 2016
                                           : Argued:  October 20, 2016
Seth Allen Stine, Commonwealth of          :
Pennsylvania Department of                 :
Transportation and the Borough of          :
Waynesboro                                 :


BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
          HONORABLE P. KEVIN BROBSON, Judge
          HONORABLE DAN PELLEGRINI, Senior Judge


OPINION NOT REPORTED


MEMORANDUM OPINION BY
SENIOR JUDGE PELLEGRINI                    FILED: November 15, 2016


        Sara Hoover (Hoover) appeals the order of the Court of Common Pleas of the 39th Judicial District, Franklin County branch (trial court) granting the Borough of Waynesboro (Waynesboro) and the Commonwealth of Pennsylvania, Department of Transportation's (PennDOT) motions for summary judgment. For the reasons that follow, we affirm.


**I.**

**A.**

        On the morning of May 20, 2013, Hoover was walking in the crosswalk at the T-intersection of West Main Street, a state highway, and Fairway

Avenue in Waynesboro, Franklin County. When Hoover reached the intersection, she pressed a button at the crosswalk activating the Rectangular Rapid Flashing Beacons (RRFBs) which are "user-actuated amber LEDs that supplement warning signs at unsignalized intersections or mid-block crosswalks"[1] to signal that she was crossing the intersection. As the RRFBs were flashing, Hoover began crossing the street southbound when a westbound pick-up truck driven by Seth Allen Stine (Stine)[2] approached the intersection, travelling at or below the posted speed limit of 35 miles per hour. Failing to notice the RRFBs or Hoover, Stine hit Hoover, causing her to become air bound and thrown against a utility pole.

Immediately after the accident, Hoover was found unconscious, bleeding from her mouth and nose, with a deep laceration to her forehead, abrasions throughout her body and several chipped teeth. She was airlifted to the University of Maryland Shock Trauma center where she was diagnosed with a left kidney laceration, a grade 3 splenic laceration, a left femur fracture, a renal hematoma, tears of the anterior and posterior cruciate ligaments, and tears of the collateral ligament with avulsion of a large fracture fragment from the anterior lateral plateau.

---

[1] *Rectangular Rapid Flash Beacon (RRFB)*, U.S. Department of Transportation Federal Highway Administration, found at http://safety.fhwa.dot.gov/intersection/conventional/unsignalized/tech_sum/fhwasa09009/ (last visited October 3, 2016).

[2] Stine reached a settlement with Hoover and is not a party to this matter. He was precluded from filing a brief with this Court.

After the accident, the investigating Waynesboro detectives tested the RRFBs and found that the lights were operating correctly, stating that "[a]s soon as the button is pushed, the lights are activated and they continue to flash for approximately thirty seconds." (Reproduced Record (R.R.) at 716b.)[3] They also took measurements to determine the distance between the relevant RRFBs and the point at which drivers travelling westbound on West Main Street can initially see the RRFBs' flashing lights. (*Id.* at 719b.) The detectives found that "while operating a motor vehicle, both lights for the crosswalk on the north side of West Main Street could not be seen until you were 256.8 feet from the sign." (*Id.*) The detectives also "discovered that there were numerous other signs and foliage blocking the view of the crosswalk sign … [and] that you could not see a pedestrian standing at the crosswalk because of the actual crosswalk sign itself." (*Id.*) The detectives noted that the "sign was blocking the view of a pedestrian waiting to cross from the motor vehicle operators [sic] point of view." (*Id.*)

**B.**

The Vehicle Code[4] grants PennDOT and local municipalities the authority to install traffic signals and other traffic control devices on state roads. 75 Pa.C.S. § 6122(a). Before installing a traffic control device on a state highway, however, a municipality must first obtain approval from PennDOT. 75 Pa.C.S. § 6122(a)(1). In turn, PennDOT must establish rules and regulations that set forth

---

[3] Hoover filed two volumes of reproduced record and designated the pagination of Volume 1 with an "a" and that of Volume 2 with a "b." In this opinion, we will use Hoover's reproduced record pagination.

[4] 75 Pa.C.S. §§ 101-9805.

minimum standards and factors to be considered in determining whether a local authority shall be given approval for the installation and maintenance of official traffic control devices. 75 Pa.C.S. § 6122(b).[5] PennDOT's regulations must comply with the standards endorsed by the United States Department of Transportation Federal Highway Administration (FHWA) and by the FHWA's Manual on Uniform Traffic Control Devices (MUTCD).

In July 2008, the FHWA published a memorandum providing interim approval for the use of the RRFBs, noting that the interim approval would be granted:

> [F]or the optional use of the RRFB[s] as a warning beacon to supplement standard pedestrian crossing or school crossing signs or crosswalks across uncontrolled approaches to any jurisdiction that submits a written request to the office of transportation operations.

(R.R. at 328a.) In July 2009, PennDOT issued an Interim Approval for the use of the RRFBs to reduce pedestrian-vehicle collisions as part of a pilot program. The Interim Approval for the use of those flashing beacons required a municipality to, *inter alia*, obtain written approval to install the RRFBs from PennDOT. PennDOT also promulgated certain physical requirements concerning the design and installation of the RRFBs, including that the RRFBs must be installed in a location where they are clearly visible to approaching traffic from at least 200 feet away.

---

[5] Such factors "shall include, but not be limited to, the volume of traffic and the number of accidents that occurred in each of the three preceding years." 75 Pa.C.S. § 6122(b).

4

PennDOT invited Waynesboro to apply to install the RRFBs at crosswalks as part of its pilot program and also offered to finance the costs of the project. Waynesboro and PennDOT entered into a contract regarding the installation of the RRFBs and associated signage and poles on West Main Street, under which Waynesboro agreed to install the RRFBs and associated poles and signage, the design and installation of which would all be subject to the ultimate approval of PennDOT. Upon completion of installation, Waynesboro would also operate and maintain, at its sole cost and expense, all necessary improvements. Waynesboro applied for permission to install the RRFBs at four locations in Waynesboro, including the crosswalk at issue, and PennDOT granted Waynesboro permission to proceed in January 2012. Waynesboro submitted a design plan for the installation of the RRFBs at the subject crosswalk with associated poles and signage and PennDOT, after approving those plans, issued a permit for Waynesboro to install the beacons and the associated poles and signage. Waynesboro installed the RRFBs and associated poles and signage at the intersection of West Main Street and Fairview Avenue on January 18, 2013, and the RRFBs were fully operational within one to two days of installation.

## II.

## A.

In November 2013, Hoover filed suit against Stine,[6] Waynesboro and PennDOT, alleging generally that she sustained severe damages and injuries as a result of the parties' negligence and carelessness.

_____

[6] Against Stine, Hoover alleged that as a direct and proximate result of Stine's negligence and carelessness, she suffered extensive and severe injuries which "resulted in pain, suffering, **(Footnote continued on next page…)**

With respect to Waynesboro, Hoover contended that it was liable because the RRFBs located at the crosswalk were improperly obstructed by a tree on the right side of the road and a utility pole on the left side of the road, thereby resulting in inadequate sight distance. She argued that that conduct falls within the "trees and traffic control exception" of the Political Subdivision Tort Claims Act (Tort Claims Act)[7] which imposes liability on a local government or agency for:

> A dangerous condition of trees, traffic signs, lights or other traffic controls, street lights or street lighting systems under the care, custody or control of the local agency, except that the claimant to recover must establish that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred and that the *local agency had actual notice or could reasonably be charged with notice under the circumstances of the dangerous condition at a sufficient time prior to the event to have taken measures to protect against the dangerous condition.*

42 Pa.C.S. § 8542(b)(4) (emphasis added).

---

**(continued…)**

inconvenience, embarrassment, humiliation, mental anguish and the loss of enjoyment of life and life's pleasures both past and into the future." (R.R. at 12a, ¶14.) She claimed that for the aforementioned injuries, she was required to undergo hospital, medical surgical, nursing care and treatment and may continue to need such care into the future. Hoover also claimed that due to Stine's negligent and careless actions, she "has in the past and may in the future be unable to attend to and perform the duties of her vocation." (*Id.* at 13a, ¶16.)

[7] 42 Pa.C.S. §§ 8541–8542.

As to PennDOT, she alleged that it was negligent in approving the installation of the RRFBs by Waynesboro in violation of the sight line standards with which PennDOT was responsible for ensuring compliance. She argued that PennDOT should have discovered the obstructions which created dangerous conditions at the intersection either during a site inspection or upon review of Waynesboro's flawed design documents. Hoover alleged that the dangerous conditions at the intersection were caused by PennDOT's faulty and negligent approval of traffic controls in violation of its own mandatory minimum sight distances and because of Waynesboro's negligent and careless installation of the RRFBs by failing to achieve the minimum proper sight line of 325 feet.[8]

---

[8] Hoover alleged that both Waynesboro and PennDOT's negligence and carelessness consisted of the following:

> (a) failure to properly design, construct, locate and place traffic signals including the pedestrian crosswalk signs as set forth above;
>
> (b) failure to provide adequate set back from the roadway, the placement and location of the pedestrian crosswalk sign;
>
> (c) failure to adhere to applicable PennDOT and applicable minimal industry standards and the placement and location of the pedestrian crosswalk sign;
>
> (d) placing a pedestrian crosswalk sign in an area where it may have been obstructed by foliage including a tree directly in front of the traffic crosswalk signs for those operating vehicles in a westbound direction;
>
> (e) failing to provide a safe roadway at the intersection of Fairview Avenue and Main Street in the borough of Waynesboro;
>
> (f) failure to take proper and necessary measures to provide the safety of pedestrians within the crosswalk on Fairview Avenue as set forth above;

**(Footnote continued on next page…)**

**B.**

In her deposition taken as part of discovery, Hoover testified that on the day of the accident, she arrived at the pedestrian crossing and she pressed the button to activate the RRFBs. While she saw at least one person on her right stop for her, she could not see anyone to her left, the direction from which Stine hit her. She testified that once she made sure that the traffic was either a safe distance away or had stopped, she walked maybe three or four steps into the crosswalk when she heard the sound of an oncoming car to her left. When she turned her head, she saw a blur of red because of how fast the vehicle was going, and then she blacked out.

In his deposition, Stine testified that he never noticed the flashing RRFBs or Hoover at any point prior to the impact, and he stated that he did not know why he did not see the flashing lights at the crosswalk. In fact, Stine stated that he did not realize he hit a pedestrian until after he stopped his vehicle to check

---

**(continued…)**

(g) improperly locating, constructing and/or maintaining a pedestrian crosswalk sign with a flashing signal in a location along the roadway that substantially increased the risk of harm to pedestrians attempting to cross W. Main Street; [and]

(h) failing to properly and effectively review and/or inspect the design, construction and/or maintenance of the traffic control devices and roadway appurtenances on W. Main Street in the vicinity of Fairview Avenue[.]

(R.R. at 14a-15a, ¶25; R.R. at 16a-17a, ¶32.)

on what he thought to be a mechanical failure. He stated that his pickup truck was equipped with daytime running lights, and he had no reason to believe that the lights were not operating properly as he approached the intersection on the day of the accident. Stine acknowledged that he has lived in Waynesboro for over 50 years, knew there was a crosswalk at that location, had seen people cross at that location before the accident, and had previously stopped for pedestrians at that crosswalk when the lights were flashing.

In a deposition of an eyewitness who was the driver of the vehicle driving a car length behind Stine's, the eyewitness testified that Stine did not slow down or brake even though the RRFBs were flashing. The eyewitness testified that she saw the flashing lights of the crosswalk light up on both sides of the street and that she had no problem seeing the lights flashing. She stated that she was horrified because she could see that Stine was driving towards Hoover with no sign of slowing down or stopping.

Hoover also submitted an expert report of Russel J. Kolmus, III, PE, which claimed that at a posted speed of 35 miles per hour, as on West Main Street, the sight distance required by the MUTCD is 325 feet. Mr. Kolmus opined in his report that the sight distances and the RRFBs did not meet engineering standards and practice; that Waynesboro's Engineering Department failed to design the accident location or construct the signs and the RRFBs in accordance with PennDOT's and the FHWA's standards; that PennDOT failed to effectively review and critique the design provided to it by Waynesboro because it allowed sight distances that failed to meet engineering standards and practice; and that PennDOT

9

failed to adequately inspect the accident location after its construction because it failed to identify sight lines and sight distances from the pedestrian crossing sign and the RRFBs to approaching westbound motorists that failed to meet engineering standards and practice.

Waynesboro's expert, Steven M. Schorr, PE, pointed out that the RRFBs are optional and supplemental to the existing traffic controls and, thus, the 325 feet sight distance would not be applicable. In his report, Mr. Schorr stated, "The [RRFBs] per the [Federal Highway Administration] memorandum, can be considered supplementary to the warning signs, not 'the' warning signs. Therefore the 325 feet 'warning sign' sight distance referred to by Mr. Kolmus would not be applicable." (R.R. at 959b, ¶3.) Mr. Schorr added:

> Even if one accepts Mr. Kolmus' conclusion that the required sight distance would be 325 feet and his acceptance of the police-noted 256.8 feet sight distance, a review of the approach to the intersection indicates that at the time of the collision, in addition to the north-side pedestrian crossing sign and RRFB's, a westbound vehicle operator had a view of the south-side pedestrian crossing sign and RRFB's, as well as a view of the "old" pedestrian crossing sign located over 100 feet east of the intersection, and a view of the painted pedestrian crossing warnings on the roadway also located east of the intersection in question. That is, a review of the site establishes that there were pedestrian warning signs and markings, independent of the RRFB's, which would have been visible to reasonable prudent westbound vehicle operators approaching the intersection in question.

(*Id.* at ¶4.)

10

After the pleadings were closed, Waynesboro and PennDOT both filed motions for summary judgment.

### C.

In its motion for summary judgment, Waynesboro contended that there was no evidence of it having actual or constructive notice of any dangerous condition at the site of the accident which is a prerequisite for a plaintiff to be able to recover under the "trees and traffic control exception" contained in the Tort Claims Act. It also argued that no evidence suggests that the tree or traffic control signals at or near the crosswalk were causal factors in Hoover's injury because Stine never noticed the RRFBs or Hoover. Waynesboro also maintained that it did not negligently or intentionally deviate from the design plans approved by PennDOT under their contract, which required Waynesboro to install the RRFBs and associated poles and signage pursuant to PennDOT-approved design specifications. *See* 42 Pa.C.S. § 8542(b)(4).

PennDOT also moved for summary judgment, arguing that it was immune from suit under the Sovereign Immunity Act, 42 Pa.C.S. §§ 8521-8528, because Hoover could not prove the requisite elements of negligence, her allegations did not fall within any exceptions to sovereign immunity, particularly the "real estate exception," 42 Pa.C.S. § 8522(b)(4), and because PennDOT did not have any actual or constructive notice of any defect. PennDOT also argued that "[b]ecause [Stine] did not see [Hoover] when she was in front of him, reasonable minds could not differ that a condition of the Commonwealth realty could not have

11

been the cause of the accident" and, thus, Hoover did not meet her burden of establishing the elements of negligence.  (*Id.* at 476b, ¶66.)

The trial court granted Waynesboro and PennDOT's motions for summary judgment.  With respect to Waynesboro, the trial court reasoned that the record showed that, at a minimum, the RRFBs and a pedestrian standing in the crosswalk were visible from at least 256.8 feet, and that in installing the RRFBs, Waynesboro relied on PennDOT's Interim Approval's requirements, which specifically called for a sight distance of 200 feet.  As to PennDOT, the trial court found that Hoover had not established that the issue of sight distance and the location of the RRFBs resulted in dangerous conditions of Commonwealth real estate because the crosswalk is not Commonwealth real estate, but rather, the crosswalk and the RRFBs are Waynesboro's responsibility to maintain.

Finding there was no evidence to suggest that either Waynesboro or PennDOT had actual or constructive notice of any dangerous conditions of the real estate or the traffic control devices, the trial court concluded that both PennDOT and Waynesboro were immune from suit for tort liability.  In coming to this conclusion, the trial court noted that there was no evidence that there were similar occurrences at the crosswalk in the period of months between the installation of the RRFBs and Hoover's accident.

It further reasoned that there was no evidence of complaints or reports of problems or concerns that could be deemed "notice" under the law.  Finally, the trial court found that Hoover offered no evidence, just mere speculation, as to why

12

Stine did not see the RRFBs or her crossing the street, thereby not establishing the element of causation required for a negligence action. In summary, the trial court explained:

> Even if the Court were to conclude that there is a genuine issue of material fact with respect to the required sight distance for RRFB[s] resulting in a dangerous condition of the Commonwealth realty and/or traffic-control device and requisite notice thereof thereby overcoming a defense of sovereign immunity, the uncontested facts of record render any debate over the regulatory requirements moot. Certainly, an additional 125 feet of sight distance *could* have permitted Stine additional time [to] react, to brake, and to ultimately avoid collision with [Hoover]. However, there is no evidence of record to permit this Court to find that it would have made any difference in this case. There is no evidence that additional time or distance within which to react or apply the brakes would have changed the unfortunate outcome. No matter the required sight distance, Stine's deposition testimony was clear that he did not see the RRFB[s] *at any distance* – 325 feet, 256.8 feet or 200 feet *or fewer*. Based on Stine's testimony, reasonable minds cannot conclude that an additional 125 feet of sight distance would have altered the outcome in this case. Reasonable minds cannot conclude that the placement of the RRFB[s], whether consistent with MUTCD requirements or not, was the cause of this tragic event. It is clear that Stine did not see the RRFB, and more importantly, he did not see [Hoover] crossing the road at any point in his approach to the crosswalk prior to striking her.

(Trial Court's Opinion dated February 12, 2016 at 12) (emphasis in original). Hoover filed the instant appeal.[9]

---

[9] Our review of a trial court order granting summary judgment is limited to determining whether the trial court abused its discretion or committed an error of law. *Manley v. Fitzgerald*,
**(Footnote continued on next page…)**

## III.

Hoover argues that the trial court erred in determining that the diminished sight distance was not a substantial contributing factor to the cause of her accident.

In order to maintain an action against a Commonwealth party or a local agency, a plaintiff must establish that he or she has a statutory cause of action or that it was one maintainable at common law and that conduct falls within one of the exceptions to immunity. *Peak v. Petrovich*, 636 A.2d 1248, 1252 (Pa. Cmwlth. 1994). Hoover brought a common law negligence action contending that both Waynesboro and PennDot were negligent in installing the RRFBs. In establishing common law negligence, the following elements must be generally met:

> 1. A duty or obligation recognized by the law, requiring the actor to conform to a certain standard of conduct, for the protection of others against unreasonable risks;
>
> 2. A failure on his part to conform to the standard required;
>
> **3. A reasonably close causal connection between the conduct and the resulting injury;**
>
> 4. Actual loss or damage resulting to the interests of another.

---

**(continued…)**

997 A.2d 1235, 1238 n. 2 (Pa. Cmwlth. 2010). Summary judgment may only be granted when, after examining the record in the light most favorable to the non-moving party, the record clearly demonstrates that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.*

14

*Farber v. Engle*, 525 A.2d 864, 867 (Pa. Cmwlth. 1987) (emphasis added).

PennDOT's Interim Approval required that the minimum sight distance be 200 feet, and the police-noted 256.8 foot sight distance at the intersection is greater than that. Although Hoover's expert opined that at 35 miles per hour the sight distance should be 325 feet, because the RRFBs are optional, supplemental safety measures in an area where there were already pedestrian warning signs and markings, independent of the RRFBs visible to vehicle operators, vehicle operators would have had sufficient warning even without the RRFBs.

Not only were the RRFBs supplemental to other pedestrian warning signs, but Stine admitted that despite being familiar with the intersection, he *never* saw the RRFBs or even Hoover until after he hit her. He also stated that he did not know why he did not see the RRFBs or Hoover, just that he did not. Meanwhile, the eyewitness driving behind Stine testified to never seeing him slow down or brake as he approached the intersection, even though she herself could see Hoover. As the trial court aptly noted:

> There is no evidence that additional time or distance within which to react or apply the brakes would have changed the unfortunate outcome. No matter the required sight distance, Stine's deposition testimony was clear that he did not see the RRFB[s] *at any distance* – 325 feet, 256.8 feet or 200 feet *or fewer*.

(Trial Court's Opinion dated February 12, 2016 at 12) (emphasis in original). Even if Hoover could make out a duty or that there was failure to conform to the

standard, all the evidence shows that there was not a reasonably close causal connection between Waynesboro or PennDOT's conduct and the resulting injury, even if the sight distance should have been 325 feet.

**IV.**

**A.**

Not only has Hoover failed to establish that Waynesboro or PennDOT's purported negligence caused her injuries, she has failed to establish that the alleged negligence fell within any exception to immunity. Relying on *Tate v. Commonwealth*, 84 A.3d 762 (Pa. Cmwlth. 2014)[10] and *Bendas v. Township of*

---

[10] In *Tate v. Commonwealth*, 84 A.3d 762 (Pa. Cmwlth. 2014), a motor vehicle collision occurred at the intersection of two state roads, only one of which had stop signs. The drivers and passengers of the vehicles sued PennDOT, arguing that the absence of a traffic signal at the intersection was a substantial factor in causing the accident and that PennDOT failed to maintain its roads in a safe manner. PennDOT moved for summary judgment, claiming it had no duty to install a traffic signal, but rather, one driver's high speed was the superseding cause of the accident. The trial court denied summary judgment and a jury found the high speed driver to be 67 percent liable and PennDOT to be 33 percent liable. PennDOT filed a motion for post-trial relief, which the trial court denied.

On appeal to this Court, PennDOT argued that: first, it has adopted a regulation that transferred the duty to install traffic signals on state roads to local municipalities, and second, the high speed driver's excessive speed was the superseding cause of the accident. Although we agreed that under the Vehicle Code, PennDOT is not required to install traffic control devices, we found that PennDOT still has "a duty to ensure that its highways are safe for their reasonably foreseen uses," and that "no agency can, by regulation, relieve itself of a duty of care or expand its own sovereign immunity beyond the scope allowed by the legislature." *Tate*, 84 A.3d at 767. Reasoning that "the failure to remedy a dangerous condition amounts to a breach of PennDOT's duty of care" and that a jury is charged with determining what constitutes a dangerous condition, we held that the trial court did not err in denying PennDOT's motion for judgment notwithstanding the verdict. *Id.*

With regard to whether the high speed driver's operation of the vehicle was reckless and constituted an unforeseeable use of the highway, we found that because expert testimony
**(Footnote continued on next page…)**

16

*White Deer*, 611 A.2d 1184 (Pa. 1992),[11] Hoover argues that the "real estate exception" to sovereign immunity, 42 Pa.C.S. § 8522(b)(4), applies because the violation of the minimum sight line requirement created a dangerous condition of a highway and not, as the trial court incorrectly referred to it, a crosswalk.

The Sovereign Immunity Act protects the Commonwealth from civil suit for tort liability unless the General Assembly specifically waives immunity. 1 Pa.C.S. § 2310.[12] *See also* 42 Pa.C.S. § 8521(a).[13] "Sovereign immunity is only

---

**(continued…)**

established that speeding was a common problem and that there had been 45 motor vehicle accidents at the intersection over a ten-year period, the speeding vehicle was foreseeable.

[11] In *Bendas v. Township of White Deer*, 611 A.2d 1184 (Pa. 1992), a motor vehicle accident occurred at the intersection of a state highway and a township road and both roads lacked traffic control devices or signs. The drivers sued PennDOT, alleging that it had either negligently failed to erect traffic control devices at the intersection or failed to correct a dangerous condition. PennDOT moved for summary judgment, arguing that it did not owe a duty of care to the plaintiffs. The trial court denied the motion, and we affirmed.

On appeal, the Pennsylvania Supreme Court identified two issues: first, whether PennDOT had a duty to make state roads safe for their intended purpose and, second, whether PennDOT's failure to satisfy that duty was actionable under an exception to sovereign immunity. Citing to *Snyder v. Harmon*, 562 A.2d 307, 312 (Pa.1989), a case in which the Court construed Section 8522(b)(4) of the Sovereign Immunity Act to mean that PennDOT must maintain a state highway in a condition that is "safe for the activities for which it is regularly used, intended to be used or reasonably foreseen to be used," the Court found that PennDOT owed a duty of care. As to the "real estate exception," the Supreme Court held that the question of what is or is not a "dangerous condition" of a highway is one of fact that "must be answered by the jury." *Bendas*, 611 A.2d at 1187. Accordingly, the Court affirmed the trial court's refusal to grant summary judgment to PennDOT.

[12] 1 Pa.C.S. § 2310 provides:

**(Footnote continued on next page…)**

17

waived for damages arising out of a negligent act where the common law or a statute would permit recovery if the injury were caused by a person not protected by sovereign immunity *and* the cause of action falls under one of the specifically

---

**(continued…)**

> Pursuant to section 11 of Article 1 of the Constitution of Pennsylvania, it is hereby declared to be the intent of the General Assembly that the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity.  When the General Assembly specifically waives sovereign immunity, a claim against the Commonwealth and its officials and employees shall be brought only in such manner and in such courts and in such cases as directed by the provisions of Title 42 (relating to judiciary and judicial procedure) or 62 (relating to procurement) unless otherwise specifically authorized by statute.

[13] Section 8521(a) of the Sovereign Immunity Act, 42 Pa.C.S. § 8521(a), states:

> Except as otherwise provided in this subchapter, no provision of this title shall constitute a waiver of sovereign immunity for the purpose of 1 Pa.C.S. § 2310 (relating to sovereign immunity reaffirmed; specific waiver) or otherwise.

Section 8522(a), 42 Pa.C.S. § 8522(a), states:

> The General Assembly, pursuant to section 11 of Article I of the Constitution of Pennsylvania, does hereby waive, in the instances set forth in subsection (b) only and only to the extent set forth in this subchapter and within the limits set forth in section 8528 (relating to limitations on damages), sovereign immunity as a bar to an action against Commonwealth parties, for damages arising out of a negligent act where the damages would be recoverable under the common law or a statute creating a cause of action if the injury were caused by a person not having available the defense of sovereign immunity.

enumerated exceptions to immunity." *Page v. City of Philadelphia*, 25 A.3d 471, 475 (Pa. Cmwlth. 2011) (emphasis added). The exceptions to sovereign immunity must be strictly construed because "the clear intent of the legislature is to insulate the government from exposure to tort liability." *Clark v. Pennsylvania Department of Transportation*, 962 A.2d 692, 694 (Pa. Cmwlth. 2008).

Here, as acknowledged by Hoover, the only possible exception under the Sovereign Immunity Act is the "real estate exception" which allows the imposition of liability on a Commonwealth party and precludes it from raising a defense of sovereign immunity when a claim for damages is caused by:

> A dangerous condition of Commonwealth agency real estate and sidewalks, including Commonwealth-owned real property, leaseholds in the possession of a Commonwealth agency and Commonwealth-owned real property leased by a Commonwealth agency to private persons, and highways under the jurisdiction of a Commonwealth agency, except [a dangerous condition of highways under the jurisdiction of a Commonwealth agency created by potholes or sinkholes or other similar conditions created by natural elements].

42 Pa.C.S. § 8522(b)(4). This "dangerous condition must *derive, originate from or have as its source the Commonwealth realty.*" *Clark*, 962 A.2d at 694 (quoting *Snyder v. Harmon*, 562 A.2d 307, 311 (Pa. 1989)) (emphasis in *Clark*).[14]

---

[14] Similar to the Sovereign Immunity Act's application to the Commonwealth, the Tort Claims Act provides that local agencies are generally immune from tort liability unless immunity is expressly waived. 42 Pa.C.S. § 8541. Under Section 8542(a) of the Tort Claims Act, 42 Pa.C.S. § 8542(a), immunity is waived where the following conditions are satisfied: (1) damages would be recoverable under statutory or common law if the injury were caused by a person not **(Footnote continued on next page…)**

PennDOT argues that although West Main Street is a highway, the crosswalk and the RRFBs at the intersection are not part of Commonwealth realty because they are installed, owned and maintained by Waynesboro, for which it cannot be liable under the "real estate exception." PennDOT further argues that it cannot be held liable under the "real estate exception" for an alleged failure to inspect, thereby allowing the sight distance to be less than the 325 feet that Hoover's expert believed was appropriate as that is not a condition of the exception.

---

**(continued…)**

protected by governmental immunity; (2) the local agency's negligent act caused the injury; and (3) the local agency's alleged negligence falls within one of the eight enumerated exceptions to governmental immunity listed in 42 Pa.C.S. § 8542(b).

The sole exception that could be applied to Waynesboro's defense of immunity is the one entitled "Trees, traffic controls and street lighting" which permits the imposition of liability on a local agency with the following act:

> A dangerous condition of trees, traffic signs, lights or other traffic controls, street lights or street lighting systems under the care, custody or control of the local agency, except that the claimant to recover must establish that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred and that the local agency had actual notice or could reasonably be charged with notice under the circumstances of the dangerous condition at a sufficient time prior to the event to have taken measures to protect against the dangerous condition.

42 Pa. C.S. § 8542(b)(4).

Although Waynesboro raises the defense of governmental immunity and the trial court addresses it in its opinion, Hoover does not mention immunity as applied to Waynesboro in her 1925(b) Statement or her brief. Accordingly, we will not examine the application of governmental immunity as applied to Waynesboro in this opinion.

In *Ryles v. City of Philadelphia*, 848 A.2d 1101 (Pa. Cmwlth. 2004), this Court addressed a claim of sovereign immunity where the City of Philadelphia and PennDOT argued over which had jurisdiction over a crosswalk at an intersection. Concluding that the alleged dangerous conditions of the crosswalk did not overcome PennDOT's claim of sovereign immunity, we explained that:

> We find *Glenn* [*v. Horan*, 765 A.2d 426 (Pa. Cmwlth. 2001)] instructive here. As stated by the court in *Glenn*, a traffic control has as its central role the regulation of traffic, whether pedestrian, vehicular or both. In this case, the z-bricks and concrete headers clearly established the path for pedestrian egress across the highway, just as the painted crosswalk did in *Glenn*, thereby serving the express dual purposes, of "guiding pedestrians" and "warning motorists" of pedestrian traffic across the road…. The crosswalk in question falls within this language and clearly acts to regulate traffic. Because the crosswalk regulates traffic, it is distinguishable from the median in *Slough* [*v. City of Philadelphia*, 686 A.2d 62 (Pa. Cmwlth. 1996)], which we found served only a negligible traffic control function. Under our analysis in *Slough*, although the crosswalk does form the surface of the roadway, given its traffic control function, it is the City's responsibility to maintain.
>
> Our conclusion is buttressed by other facts in this case. For example, the Philadelphia Code provides for the City to maintain crosswalks. In fact, the Philadelphia Code uses similar language to 67 Pa. Code § 211.1 to provide that, "The [City Department of Streets] may designate and maintain, by appropriate devices, markings, or lines upon the surface of the roadway, crosswalks at intersections." Philadelphia Code § 12-1205. It further provides that the Department "shall place and maintain all necessary traffic-control signs, signals, devices and markings."

***

21

> Further, under the contract pertaining to the Market Street improvements, the City agreed to maintain signage and traffic controls at the intersection involved. Although the agreement did not specifically include the word "crosswalk," it clearly did provide for the City to maintain signalized intersections at several intersections, including the one involved in this case. [Penn]DOT correctly notes that crosswalks are a component of signalized intersections. *See* 67 Pa. Code § 211.1174(a).

*Ryles*, 848 A.2d at 1106-07.

The RRFBs were implemented to better regulate traffic, "a warning beacon to supplement standard pedestrian crossing…." (R.R. at 328a.) Although PennDOT had to approve Waynesboro's installation plans and PennDOT dictated certain physical requirements of the RRFBs, under the parties' contract, Waynesboro was responsible for installing, operating and maintaining the RRFBs. Because the crosswalk is not PennDOT's real estate, Hoover has not met her burden of establishing that the "real estate exception" negates PennDOT's sovereign immunity.

## B.

Hoover also argues that Waynesboro had actual and constructive notice of the dangerous condition of the crosswalk on West Main Street and Fairway Avenue that contributed to her serious accident and that the trial court erred in concluding otherwise.

The Tort Claims Act provides that the plaintiff bears the burden of establishing that the local agency that purportedly contributed to a dangerous

condition of trees or traffic controls "had actual notice or could reasonably be charged with notice under the circumstances of the dangerous condition at a sufficient time prior to the event to have taken measures to protect against the dangerous condition."  42 Pa.C.S. § 8542(b)(4).

Hoover contends that Waynesboro had notice of the dangerous condition because when it installed the RRFBs at the intersection, it was required to know and comply with the sight line standards.  Because it did not adhere to the correct standard of meeting a sight line of 325 feet, it "would have been aware that the sight line that existed was well shy of the required minimum sight line due to visual obstructions on both sides of the roadway."  (Hoover's Brief at 22.)

Despite Hoover's speculations that Waynesboro had notice through its design, installation and approval of the RRFBs, there is no evidence of any notice.  After the warning lights had been installed, there were no accidents involving the crosswalk until Hoover's.  There was no evidence of poor visibility of the RRFBs, no evidence that the RRFBs were not working, that trees or utility poles obstructed the RRFBS or other related complaints.  In fact, the RRFBs were installed to improve upon the safety measures already in place.  Without evidence to the contrary, the parties would have had absolutely no reason to believe, or have notice, that the safety measures could actually be "dangerous conditions."  Moreover, the sight distance being less than 325 feet is not a reason for Waynesboro or PennDOT to have notice of a potential dangerous condition

23

because PennDOT's Interim Approval required that the minimum sight distance be 200 feet, with which the RRFBs were in compliance.[15]

Given the lack of accidents at the crosswalk or any complaints with the RRFBs or visibility issues or the like, there was no evidence to indicate that Waynesboro had notice of any alleged dangerous condition. As such, the trial court correctly determined the issue of notice.

---

[15] Hoover also claims that PennDOT had notice of the dangerous condition of the intersection through its responsibility of granting Waynesboro its permits to install the RRFBs, which requires that PennDOT examine Waynesboro's designs and then visit the actual site for the purpose of ensuring compliance with sight line standards. Hoover explains, "Notably, here, not only did the design documents received by [PennDOT] display the sight line obstructions (the tree and utility pole), PennDOT, indeed, performed the site inspection, at which time it actually had the opportunity to observe the obstructions and inadequate sight lines." (Hoover's Brief at 23.)

Unlike the exception for local agencies, the Commonwealth agency highway exception does not specifically provide for actual or constructive notice of the dangerous condition of the highway. However, because it is a prerequisite that an action must be maintainable at common law, and at common law the action required such notice, the Commonwealth agency must have actual or constructive notice of the dangerous condition to maintain an action under the exception. Under the common law formulation, apart from faulty construction work, the liability of the governmental entity for injuries suffered as a result of defects in the highway arose only when it had either actual or constructive notice of the dangerous condition. For the governmental entity to be charged with constructive notice of the dangerous condition of a roadway, that condition had to be apparent upon reasonable inspection. *Patton v. Commonwealth of Pennsylvania*, 669 A.2d 1090 (Pa. Cmwlth. 1996); *Fidanza v. Department of Transportation*, 655 A.2d 1076 (Pa. Cmwlth. 1995).

Even if we had not held that the conduct could fall within the highway exception at all, the claimed negligence would not fall within this exception because, as explained above, there was no reason to believe that the RRFBs were designed or installed negligently.

## V.

Accordingly, for the foregoing reasons, we affirm the trial court's order.

_____
DAN PELLEGRINI, Senior Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Sara Hoover,                      :

               Appellant         :

                            :

          v.              : No. 532 C.D. 2016

                            :

Seth Allen Stine, Commonwealth of   :

Pennsylvania Department of         :

Transportation and the Borough of    :

Waynesboro                    :

# **O R D E R**

AND NOW, this 15th day of  November, 2016, the order of the Court of Common Pleas of the 39th Judicial District, Franklin County branch, dated February 12, 2016, at No. 2013-4467, is affirmed.

_____

DAN PELLEGRINI, Senior Judge